DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

KAREN BEAUSEY (CABN 155258)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6598
    FAX: (415) 436-7234
    Karen.Beausey@usdoj.gov

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>$51,574 in United States Currency,<br><br>    Defendant. | CASE NO.<br><br>**VERIFIED COMPLAINT FOR FORFEITURE**<br>***IN REM*** |

## NATURE OF THE ACTION

1. This is a judicial forfeiture action, as authorized by Title 21, United States Code, Section §§ 853 and 881(a)(6), involving the seizure and forfeiture to the use and benefit of the United States of America the following property:

$51,574 in United States Currency seized by law enforcement officers from Alberto FLORES

1

and Andrea Ospina on or about September 10, 2019, and currently in the custody of the United States Drug Enforcement Administration ("DEA");

(hereinafter, "Defendant Property"), as property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of a violation of 21 U.S.C. §§ 841 and/or 846, and thereby forfeitable pursuant to 21 U.S.C. § 881(a)(6).

## JURISDICTION AND VENUE

2. This Court has jurisdiction under 28 U.S.C. §§ 1345 and 1355, and 21 U.S.C. § 881(a)(6).

3. Venue is proper in this district pursuant to 28 U.S.C. §§ 1355 and 1395 because the acts or omissions giving rise to the forfeiture occurred in this district and the Defendant Property is located in this district.

4. Intra-district venue is proper in the San Francisco within the Northern District of California.

## PARTIES

5. Plaintiff is the United States of America.

6. The Defendant Property consists of $51,574 in United States Currency seized by law enforcement officers from Alberto FLORES and Andrea Ospina on or about September 10, 2019, and currently in the custody of the DEA.

## FACTS

7. On September 10, 2019, Cincinnati DEA Task Force Agent Ken Coyle received information from a confidential source (CS) that on September 9, 2019, James Sparks, Alberto FLORES, and Andrea Ospina made round trip reservations to fly from Dallas, Texas to San Francisco International Airport (SFO) on September 10, 2019 (the next day), via American Airlines Flight #1260. Their flight was scheduled to arrive in San Francisco at 12:17 p.m. local time, but was delayed and did not arrive until around 1:40 p.m. Sparks, FLORES, and Ospina were scheduled to depart San Francisco

2

for their return flight to Dallas on September 11, 2019 at 6:00 p.m., less than 30 hours after arriving in San Francisco.

8. Sparks paid $706.60 for each of the three airline tickets, and paid for each reservation on a credit card. Sparks, FLORES and Ospina sat together on the flight (in seats 34D, 34E, and 34F). Neither of the travelers checked any luggage on their San Francisco-bound flight.

9. TFO Coyle conducted a criminal history check of Sparks, FLORES, and Ospina, and found none had any prior criminal history. TFO Coyle passed the information he had learned about Sparks, FLORES, and Ospina to San Francisco DEA Task Force #2 at SFO.

10. Task Force #2 officer Blake Molyneux conducted a computer records check of Sparks and located a Texas Driver's License.

11. In TFO Molyneux's training and experience, he knew that most travelers attempt to book airline travel at least two weeks in advance of the flight date in order to receive the lowest possible fare. He also knew that most travelers to the San Francisco Bay Area who come as tourists seek to stay for at least two days, and that most working people would consider paying $760 in airfare to visit the area for less than 30 hours to be an extravagance. On the other hand, in his experience individuals who fly to San Francisco with the intention of purchasing illegal drugs frequently make their airline reservations shortly before the date of travel and frequently spend very little time (often less than two days) in California before returning to their city of origin.

12. In light of the information related to them by TFO Coyle and what they viewed as the suspicious nature of Sparks', FLORES', and Ospina's travel, San Francisco Task Force #2 officers decided to meet Sparks, FLORES, and Ospina at SFO and to seek an interview with any or all of them regarding the purpose of their travel to California.

13. Accordingly, on September 10, 2019, at approximately 1:20 p.m., TFOs Blake Molyneux and Steve Maes, accompanied by other Task Force #2 agents, established surveillance at American

3

Airlines gate 45B in anticipation of the arrival of passengers from American Airlines Flight #1260. At approximately 1:50 p.m., TFO Molyneux and TFO Steve Maes observed Sparks (identified via comparison with his Texas Driver's License photograph) exist the gate in the company of a male companion (subsequently identified as FLORES) and a female companion (subsequently identified as Ospina). All three were seen talking together as they walked together in the direction of the exit of the terminal. TFO Maes noticed FLORES was carrying a black and gray backpack and a rolling small blue suitcase as his carry-on items.

14. A few minutes after FLORES and his companions emerged from the aircraft, at approximately 1:55 p.m., Task Force agents approached the three traveling companions to conduct consensual conversations. TFO Maes and TFO Victor Bertolozzi approached FLORES, TFO Ariana Daggett approached Ospina, and TFO Molyneux approached Sparks (SA George Krieg joined TFO Molyneix and Sparks a few minutes after their conversation began). TFO Maes called out to FLORES by saying "Alberto Flores." FLORES slowed down and turned toward TFO Maes' voice. TFO Maes asked FLORES, "can I speak with you?" FLORES replied "yes," indicating his agreement to speak with TFO Maes.

15. Before asking FLORES any other questions, TFO Maes informed FLORES he was not under arrest and that he was free to leave at any time, which FLORES appeared to understand. Throughout the ensuing conversation, TFOs Maes and Bertolozzi stood to the side of FLORES at a conversational distance, and situated themselves so as to avoid blocking FLORES's path of travel or access to the door. In addition, throughout the conversation TFO Maes spoke in a calm, normal tone of voice at a conversational volume loud enough for FLORES to be able to hear but not so loud as to be easily overheard by other people in the vicinity. Throughout the conversation FLORES spoke in a similarly calm and conversational manner at an appropriate volume.

16. All TFOs were wearing plain clothes and were not visibly displaying firearms or other

4

weapons, and each identified themselves as agents of the Drug Enforcement Administration and displayed their law enforcement credentials so they could be inspected by the traveling companions. The conversations all took place in close proximity to each other, approximately 30 feet to 40 feet from the exit from the terminal to the curb, and at all times Sparks, FLORES, and Opsina had clear, unobstructed paths to walk away from the conversations had they chosen to do so.

17. TFO Maes asked FLORES if he was in San Francisco for business or pleasure. FLORES stated, "pleasure. I'm going to purchase my wife [Ospina] a ring." TFO Maes asked how long they were going to be in the area, and FLORES stated "a couple days." TFO Maes knew this was not a truthful response, as he already knew FLORES, Sparks, and Ospina were scheduled to return to Dallas the next day.

18. While TFOs Maes and Bartolozzi were speaking with FLORES, TFO Daggett was speaking with Ospina about 20 feet away. Ospina consented to a search of her bag and TFO Daggett discovered a stack of U.S. Currency within her wallet. Ospina stated that Flores gave her the money to hold and to use for their expenses during the trip, and stated "that's not my money." Ospina explained, "I don't have any money, I'm a student." Ospina also stated that she didn't know the name of the other person they were traveling with (Sparks), despite the fact that Sparks had purchased her airline ticket.

19. TFO Maes asked FLORES who he was traveling with, and FLORES stated "my wife [Opsina] and friend [Sparks]." TFO Maes asked FLORES if he had any identification, and FLORES provided him with a Texas driver's license in the name Alberto Flores. TFO Maes quickly returned FLORES' license. TFO Maes asked FLORES if he had ever been arrested, and FLORES replied "no." FLORES then stated, "don't embarrass me in front of my wife" and "don't spoil my surprise." FLORES informed TFO Maes again that he was planning to purchase a wedding ring for Ospina while they were in San Francisco. FLORES stated they had been married for about a month. TFO Maes found this to be suspicious because if FLORES had saved sufficient money to purchase a wedding ring in September, he

5

should have had all or most of that money saved when they married one month earlier. TFO Maes also knew FLORES was scheduled to fly back to Dallas in less than 30 hours, which when one considered travel time to and from the airport and the time necessary to clear security at the airport, scarcely gave FLORES one day to shop for a wedding ring.

20. TFO Maes explained to FLORES that he and the other officers were part of a task force attempting to control the drug trafficking trade through the use of airports. TFO Maes asked FLORES if he was carrying any drugs or anything illegal, and FLORES said he was not. TFO Maes asked FLORES if they could search his suitcase and backpack to confirm he was not in possession of any illegal narcotics, and FLORES immediately stated "yes." Prior to searching either bag, TFO Maes asked FLORES if FLORES had packed the bags himself, and FLORES stated he had.

21. TFO Bertolozzi searched FLORES's backpack, and inside the pockets of a pair of pants found within the backpack he found a large bundle of U.S Currency. TFO Bertolozzi then searched FLORES' suitcase and found an additional bundle of U.S. currency inside another pair of pants. The suitcase contained both male and female clothing.

22. FLORES was wearing a fanny pack. TFO Maes asked for and received consent from FLORES to search the fanny pack. Inside the fanny pack TFO Maes found another bundle of currency.

23. In his training and experience, TFO Maes recognized the manner in which the currency was packed as consistent with narcotics smuggling. Specifically, the bundling of the money in rubber-banded stacks, the use of $50 and $100 bills (rather than an assortment of denominations), and the concealment of the money were methods of transporting money that TFO Maes had observed used by narcotics traffickers in other investigations in which he had worked.

24. FLORES stated he had approximately $20,000 in U.S. Currency between what he was carrying personally and what Ospina was carrying for him. FLORES informed TFO Maes that the money found in Ospina's wallet belonged to him.

6

25.     TFO Maes asked FLORES why he had so much cash.  FLORES replied "I'm gonna buy a ring."  However, FLORES could not provide the name of any jeweler from whom he planned to purchase the ring.  Instead, FLORES stated that their traveling companion, Sparks, had family in the Bay Area and was going to help him purchase the ring.

26.     TFO Maes asked FLORES if FLORES withdrew the cash from a bank, and FLORES responded that he had withdrawn the cash "from my Wells Fargo Bank."  TFO Maes found this suspicious as Wells Fargo Bank has numerous branches in the Bay Area, and FLORES could just as easily – and far more safely – have withdrawn any cash he needed from a Bay Area branch rather than risk losing such a large amount of cash (or having it stolen) by transporting it from Texas.  In his training and experience TFO Maes knows it is highly unusually for legitimate tourists and visitors to travel with large amounts of cash, and that they (like most people in their daily lives) generally prefer to use credit cards and other forms of electronic payment.  He further knows that individuals involved in the purchase and/or sale of controlled substances frequently bring large amounts of cash when traveling to California to purchase controlled substances or to pay for previously-purchased controlled substances, and that individuals who sell controlled substances usually prefer to be paid in cash to avoid creating a paper trail.

27.     TFO Maes asked FLORES what FLORES did for a living.  FLORES stated he worked two jobs:  a job in marketing for Stream Energy, and a job at a construction company named Y&K Construction.  FLORES stated he had been working for both companies for approximately a year and a half.  FLORES stated he earned approximately $6,500 per month total from both jobs, and that he and Ospina lived with a roommate and paid $2000 a month in rent which he split with Ospina and the roommate.

28.     FLORES insisted that the cash found within his bags and within Ospina's bag belonged to him. TFO Maes asked whether Sparks was also carrying any money, and FLORES stated he did not

know.

29. While FLORES was speaking with TFO Maes, Sparks spoke with TFO Molyneux and consented to a search of his backpack. Inside Sparks' backpack TFO Molyneux found several rubber-banded bundles of U.S. Currency; two bundles inside his wallet (which was found inside the backpack) and two bundles in interior pockets of the backpack. A quick examination revealed that as with the cash found in FLORES' and Ospina's bags, the cash found in Sparks' backpack appeared to be all $100 bills and $50 bills. TFO Molyneux asked Sparks if the money belonged to him, but Sparks did not answer. Instead, he stood in silence and stared at the nearby encounter between TFO Maes and FLORES. To TFO Molyneux, Sparks appeared to be frozen with nervousness.

30. In response to additional questions, Sparks stated he was merely a courier of the money, and that "they" (who he would not identify) told him to bring the money from Texas to California. Sparks said he had brought money to California on several other occasions for "them," and that he assumed the money was to purchase drugs but he did not know for sure because he was only a courier. Sparks said "they" paid him for his travel, but he did not state whether he was paid a fee to bring the money to California. TFO Molyneux asked why he would act as a money courier if he was not paid a fee, but Sparks did not respond. TFO Molyneux asked whether FLORES and Ospina were also couriers, and Sparks said he did not know and whatever they were doing was on them and their own doing. Sparks could not provide any details about where he was supposed to take the money once he arrived in California. He insisted he truly did not know how much money he was transporting, and said he was only doing his job as a courier moving money from Texas to California. He then refused to provide any further details about the money in his possession or his work couriering money. Sparks did not state any intention of assisting FLORES with purchasing a wedding ring.

31. TFO Maes explained to FLORES the U.S. Currency located in his roller suitcase, his backpack, his fanny pack, and inside Ospina's wallet was going to be detained based on the totality of

8

the circumstances, as he suspected the money was brought to California with the intent to purchase drugs or was the proceeds of a drug transaction. FLORES did not protest the seizure and did not provide any further explanation for being in possession of such a large sum of U.S. Currency.

32. TFO Maes secured currency in a DEA self-sealing evidence envelope, which was witnessed by TFO Bertoluzzi and FLORES. TFO Maes provided FLORES with a receipt for the currency, and explained the asset forfeiture process to FLORES, who appeared to understand. TFOs Maes and Bertoluzzi provided their business contact information on the receipt and FLORES signed the receipt and was given a copy. FLORES also signed the DEA self-sealing envelope as the owner/possessor of the currency. FLORES stated he did not have any questions and that he did not have an attorney, and the interview ended at approximately 2:10 p.m., approximately 15 minutes after it began.

33. Shortly after separating from FLORES, TFO Maes placed the DEA self-sealing evidence envelope containing the U.S. Currency inside a fire extinguisher locker in Terminal 3 of SFO. Earlier that morning (at approximately 10:00 a.m.), TFO Bertolozzi had his certified drug detection canine, Cooper, examine the area. At that time, Cooper did not alert to any drug odors in the area. At approximately 2:16 p.m., after the bag containing the currency seized from FLORES had been placed inside the locker, Cooper once again examined the area and this time alerted to the odor of drugs when he came upon the fire extinguisher locker. This indicated to TFO Bertolozzi that the odor of narcotics was emanating from the currency.

34. TFO Molyneux maintained custody and control of the DEA self-sealing evidence envelope until he and TFO Bertolozzi transported it to Bank of America. Once there, the money in FLORES's possession was counted and determined to be $51,574.00. As noted, FLORES stated to TFO Maes that he was carrying roughly $20,000, less than half of the true amount.

35. TFO Molyneux subsequently obtained a report of FLORES' work history from the State

9

of Texas. According to the State of Texas, FLORES had no reportable income for 2018 or 2019. For 2015, Texas reported FLORES earned a total of $6,532 in reportable income, for 2016 he earned $28,339, and for 2017 he earned $10,907 with no reportable income for the third or fourth quarters of the year. Notably, FLORES's sources of income did not include any companies named Stream Energy or Y&K Construction.

36. The DEA timely initiated administrative forfeiture proceedings against the Defendant Property. On November 27, 2019, DEA received a timely claim for the Defendant Property from FLORES. Pursuant to 18 U.S.C. § 983(a)(3)(A) the United States thereafter had ninety (90) days within which to initiate judicial forfeiture proceedings. The instant complaint is filed within that 90-day time limit.

## **CLAIM FOR RELIEF**

1. The United States incorporates by reference the allegations in paragraphs 1 through 32 as though fully set forth herein.

2. Title 21, United States Code, Section 841(a) prohibits the manufacture, distribution, or dispensing, and possession with the intent to distribute a controlled substance.

3. Title 21, United States Code, Section 846 makes it a crime to attempt or to conspire to violate Title 21, United States Code, Chapter 13, Subchapter I, including Title 21, United States Code, Sections 841(a).

4. Title 21, United States Code, Section 853 provides that any person convicted of violating (among other things) Title 21, United States Code, Sections 841(a) and 846 shall forfeit any property constituting or derived from any proceeds the person obtained, directly or indirectly, as the result of that violation, and any of the person's property used, or intended to be used, in any manner or part, to commit or to facilitate the commission of that offense.

5. Title 21, United States Code, Section 881(a)(6), provides, in part, for the forfeiture of all

moneys, securities or other things of value furnished or intended to be furnished to a person in exchange for a controlled substance, all proceeds traceable to such an exchange, and all moneys and securities used or intended to be used to facilitate any violation of Title 21, United States Code, Chapter 13, Subchapter I, including violations of Title 21, United States Code, Sections 841(a) and 846.

6. In light of the foregoing, and considering the totality of the circumstances, there is probable cause to believe that the Defendant Property represents proceeds traceable to money, securities or other things of value furnished to a person in exchange for a controlled substance, or intended to do so, in violation of Title 21, United States Code, Sections 841(a) and 846, and thus subject to forfeiture under Title 21, United States Code, Sections 853 and 881(a)(6).

WHEREFORE, plaintiff United States of America requests that due process issue to enforce the forfeiture of the Defendant Property; that notice be given to all interested parties to appear and show cause why forfeiture should not be decreed; and that judgment of forfeiture be entered; that the Court enter judgment forfeiting the Defendant Property; and that the United States be awarded such other relief as may be proper and just.

DATED: February 25, 2020                     Respectfully submitted,

                                             DAVID L. ANDERSON
                                             United States Attorney

                                             _____
                                             Karen D. Beausey
                                             Assistant United States Attorney

**VERIFICATION**

I, Drug Enforcement Administration Task Force Agent Steve Maes, state as follows:

1. I am a Task Force Agent with the Drug Enforcement Administration. I am a case agent assigned to this case. As such, I am familiar with the facts and the investigation leading to the filing of this Complaint for Forfeiture.

2. I have read the Complaint and believe the allegations contained therein to be true.

\*   \*   \*   \*   \*

I declare under penalty of perjury that the foregoing is true and correct. Executed this 25 day of February, 2020, in SAN FRANCISCO California.

_____
Task Force Agent Steve Maes
Drug Enforcement Administration

12

JS-CAND 44 (Rev. 07/19)

# CIVIL COVER SHEET

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**
United States of America

**DEFENDANTS**
$51,574 in United States Currency

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
AUSA Karen Beausey
450 Golden Gate Avenue
San Francisco, CA 94102

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- [X] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | 1 | 1 | Incorporated *or* Principal Place of Business In This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated *and* Principal Place of Business In Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [X] 625 Drug Related Seizure of Property 21 USC § 881 | 422 Appeal 28 USC § 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury – Product Liability | 690 Other | 423 Withdrawal 28 USC § 157 | 376 Qui Tam (31 USC § 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability | 367 Health Care/ Pharmaceutical Personal Injury Product Liability | **LABOR** | **PROPERTY RIGHTS** | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | | 710 Fair Labor Standards Act | 820 Copyrights | 410 Antitrust |
| 150 Recovery of Overpayment Of Veteran's Benefits | 330 Federal Employers' Liability | 368 Asbestos Personal Injury Product Liability | 720 Labor/Management Relations | 830 Patent | 430 Banks and Banking |
| 151 Medicare Act | 340 Marine | **PERSONAL PROPERTY** | 740 Railway Labor Act | 835 Patent—Abbreviated New Drug Application | 450 Commerce |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 345 Marine Product Liability | 370 Other Fraud | 751 Family and Medical Leave Act | 840 Trademark | 460 Deportation |
| 153 Recovery of Overpayment of Veteran's Benefits | 350 Motor Vehicle | 371 Truth in Lending | 790 Other Labor Litigation | **SOCIAL SECURITY** | 470 Racketeer Influenced & Corrupt Organizations |
| 160 Stockholders' Suits | 355 Motor Vehicle Product Liability | 380 Other Personal Property Damage | 791 Employee Retirement Income Security Act | 861 HIA (1395ff) | 480 Consumer Credit |
| 190 Other Contract | 360 Other Personal Injury | 385 Property Damage Product Liability | **IMMIGRATION** | 862 Black Lung (923) | 485 Telephone Consumer Protection Act |
| 195 Contract Product Liability | 362 Personal Injury -Medical Malpractice | **PRISONER PETITIONS** | 462 Naturalization Application | 863 DIWC/DIWW (405(g)) | 490 Cable/Sat TV |
| 196 Franchise | **CIVIL RIGHTS** | **HABEAS CORPUS** | 465 Other Immigration Actions | 864 SSID Title XVI | 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | 440 Other Civil Rights | 463 Alien Detainee | | 865 RSI (405(g)) | 890 Other Statutory Actions |
| 210 Land Condemnation | 441 Voting | 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | 891 Agricultural Acts |
| 220 Foreclosure | 442 Employment | 530 General | | 870 Taxes (U.S. Plaintiff or Defendant) | 893 Environmental Matters |
| 230 Rent Lease & Ejectment | 443 Housing/ Accommodations | 535 Death Penalty | | 871 IRS–Third Party 26 USC § 7609 | 895 Freedom of Information Act |
| 240 Torts to Land | 445 Amer. w/Disabilities– Employment | **OTHER** | | | 896 Arbitration |
| 245 Tort Product Liability | 446 Amer. w/Disabilities–Other | 540 Mandamus & Other | | | 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 290 All Other Real Property | 448 Education | 550 Civil Rights | | | 950 Constitutionality of State Statutes |
| | | 555 Prison Condition | | | |
| | | 560 Civil Detainee– Conditions of Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation–Transfer
- [ ] 8 Multidistrict Litigation–Direct File

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Title 21, United States Code, Sections 853 and 881(a)(6)
Brief description of cause:
Drug Related Forfeiture

**VII. REQUESTED IN COMPLAINT:**
CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, Fed. R. Civ. P.
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND:  [ ] Yes  [X] No

**VIII. RELATED CASE(S), IF ANY** *(See instructions)*:
JUDGE
DOCKET NUMBER

**IX. DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)**
*(Place an "X" in One Box Only)*
[X] SAN FRANCISCO/OAKLAND      [ ] SAN JOSE      [ ] EUREKA-MCKINLEYVILLE

DATE 02/25/2020      SIGNATURE OF ATTORNEY OF RECORD   */s/ Karen Beausey*